IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

ADRIAN ADOPHUS ALEXANDER      *

                                    *      Civil Case No. AW-08-3045

       v.                            *      Criminal Case No. AW-03-0321

                                    *

                                    *

UNITED STATES OF AMERICA      ******

## MEMORANDUM OPINION

### I

Before the Court is a Motion/Petition by the Petitioner/Defendant, Adrian Adolphus Alexander, for relief pursuant to 18 U.S.C. § 2255. The Government has opposed the Petition through its response, and Petitioner has filed a reply or traverse to the Government's opposition. The matter is now ripe for resolution.

### II

Some brief background information is in order. Petitioner (Adrian Adolphus Alexander), Ramone Stephone Jones, Deone Antonio Melvin, and Stephon Mason, along with 11 others were charged in a 15- count federal indictment in Maryland handed down on July 9, 2003. Although the charges varied with respect to each defendant, the essential charges ranged from conspiracy to distribute and possess with the intent to distribute cocaine and cocaine base, money laundering, possession of a firearm by a convicted felon and possession of firearm in furtherance of a drug trafficking crime. On November 13, 2003, Petitioner, Melvin, Mason and Jones were charged along with 12 others in a 15-count superseding indictment again alleging drug trafficking, money laundering and/or possession of firearms. Petitioner, Melvin, Mason and Jones went to trial. A number of co-

conspirators testified during the trial. The record is quite voluminous but the Court will briefly summarize the operative facts.

Commencing in 1997, Shahid Omar ran a drug distribution operation in Maryland. Omar obtained his cocaine in New York from Franscisco Despiau who had several different sources of supply. Omar made regular trips to New York, often accompanied by Mason, and traveled in vehicles containing hidden compartments used for storing drugs. Once the cocaine arrived in Maryland, Omar sold it to customers, including Mason who was also a customer. Mason in return had customers, including a customer somewhere in 1999 by the name of Aaron Harrod. On September 4, 1999, Harrod met Omar and Mason to consummate a three kilogram transaction. After Harrod approached the vehicle and handed Mason $66,000, Omar shot Harrod about 8 or 9 times. Harrod survived and was later bribed for $25,000 by Mason not to testify against Omar. Although Harrod signed an affidavit that Omar did not shoot him, nevertheless at Omar's trial, Harrod testified truthfully. While Omar was incarcerated, Mason took the helm and began a relationship with Despiau where he traveled on several occasions to New York to make numerous drug purchases, paying Omar a fee for having given Mason the (Despiau) source. In April of 2000, Mason was stopped and his blue Ford Windstar was searched wherein weapons were seized, including, the gun which Omar had used to shoot Harrod. Mason was arrested and incarcerated. Melvin and Jones then took the leadership of the organization and traveled to New York to purchase drugs and numerous vehicles with hidden compartments from Despiau. Melvin and Jones [occasionally accompanied by others who rode with them] made purchases of approximately 10 kilograms of cocaine each week. Most of the vehicles equipped with hidden compartments were placed in the names of others different from the true users and drivers. Melvin

and Jones were also assisted from time to time by drivers who picked up and delivered drug money to Despiau. Melvin employed Petitioner as driver and Jones used Bennie Wilder.

While incarcerated, Mason sent letters insisting that Melvin and Jones pay him a fee each time they obtained cocaine from Despiau. In summer of 2002, Mason was released from incarceration and Mason, Melvin and Jones continued to purchase cocaine from Despiau. Between summer of 2002 and spring of 2003, Mason, Melvin and Jones distributed at least 80 kilograms of cocaine. Mason distributed both cocaine and crack which he prepared in a microwave. By the spring and summer of 2003, Mason and Jones had incurred significant debt on the cocaine purchases. As a result Despiau cut off the supply which frustrated Jones, Melvin, Mason and Petitioner. During the summer of 2003 the investigation continued with Title III interceptions over targeted and related telephones. Law enforcement officials overheard numerous conversations regarding drug purchases, distributions, the problems with the indebtedness to Despiau, and the search for potential new sources. The wiretaps also enabled law enforcement officials to learn about the titling of vehicles in names of others, about which vehicles had hidden compartments, about ways to hide the cocaine brought back from New York, and about where and in which residences they should store and hide weapons.

Melvin and Petitioner were overheard discussing which vehicles with hidden compartments should be taken to New York for the purpose of bringing back cocaine and strategies for avoiding police detection during these trips. There was significant evidence concerning the possession and use of firearms. Despiau testified as to seeing a firearm inside a drug trap in a vehicle driven by Jones. Melvin and Jones were overheard discussing an incident in which Petitioner had fled from police after being stopped because he had a gun in the glove compartment. Petitioner, in another intercepted call,

described an incident at a club in which he was shot at and had to go to his vehicle to retrieve a gun and return fire. Jones was overheard discussing with a co-defendant the need to relocate firearms at different locations. Another co-defendant, Bennie Wilder, was overheard mentioning to Mason that he was going to give a gun to Jones. In still another overheard conversation, Mason indicated that Jones had access to several firearms and would provide one to Mason. Moreover, during other wiretap calls, Jones and Melvin discussed placing guns at 4310 Lavender Lane [which was the home of Dana Dark] out of fear that law enforcement officials might search their apartment.

The investigation concluded on July 31, 2003 with the execution of multiple search warrants. The law enforcement officers found a Glock .45 caliber pistol in Melvin's bedroom at the apartment Melvin shared with Jones in Upper Marlboro, Maryland. At the Lavender Land address, agents recovered a Ruger 9 mm pistol, a Heckler & Koch .40 caliber pistol, an Intratec 9 mm pistol, and a Masterpiece Arms .45 caliber pistol. Law enforcement also agents recovered at Mason's home in Fort Washington, Maryland a RG .38 caliber revolver with an obliterated serial number. In addition, agents found in a hidden compartment within a blue Ford Explorer [which was parked at Masons' home in Fort Washington, Maryland] approximately 125 grams of cocaine and a Heckler & Koch .45 caliber pistol. The blue Ford Explorer had been identified as one of several vehicles utilized during the course of the alleged conspiracy.

In December 2003, law enforcement agents spotted the Chevrolet Tahoe at Petitioner's girlfriends house. While no-one responded to a knock on the door by agents, shortly thereafter, Petitioner [who was a fugitive at the time] emerged from his girlfriend's home on Cooper Lane, in Hyattsville, Maryland, as or soon after the Chevrolet Tahoe was being towed. Petitioner was carrying the keys to the Tahoe as he approached the agents. Petitioner later explained that the tow truck apparently had triggered the Tahoe's alarm. The agents found a Heckler and Koch .40 caliber USP

handgun in a Chevrolet Tahoe which was registered to Petitioner's brother but had been used by Petitioner on multiple occasions. During the encounter with law enforcement agents and having learned that the Tahoe had been towed away, Petitioner repeatedly asked [not in response to any interrogation] where's my truck, what happened to my truck [referring to the Tahoe as "my truck"], yet when asked whether there was anything in the truck the agents needed to know about, Petitioner responded, No, what truck are you talking about? What truck?

On July 20th, 2004, a jury was unable to reach a verdict on count I--deadlocking on the conspiracy charge--which was lodged as to Petitioner. Following a retrial in June of 2005 on a second superseding indictment, Petitioner was convicted by a second jury of count (1) conspiracy to distribute and to possess with intent to distribute five kilograms or more of cocaine and fifty grams or more of cocaine base (crack); and count (13) possession of firearm after conviction for a felony.

On September 29, 2005, the Court sentenced Petitioner to 295 months as to Count (I) one and a concurrent sentence of 120 months for count (13) thirteen. The Court also imposed five and three concurrent years of supervised released respectively on the two counts. Petitioner appealed his verdict and judgment to the United States Court of Appeals for the Fourth Circuit where his sentenced was affirmed on July 13, 2007. (*See*, 2007 WL 2046735 (C.A.4 (Md).) A Petition for *Writ of Certiorari* in the United States Supreme Court was denied on November 13, 2007. This present Motion/Petition to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 (paper #613-1) was timely filed on November 12, 2008 and the Motion is now ripe for resolution.

## III

From a review of both the Motion to Vacate as well as Petitioner's Memorandum in support of his Motion, the Motion presents essentially (3) three issues or claims which Petitioner argues entitle him to relief under 18 U.S.C. § 2255. **First**, Petitioner claims that he is a victim of ineffective

assistance of trial counsel based upon the failure of counsel in the second trial to call the same prepared and ready witnesses who were used and called during Petitioner's defense in the first trial and whose testimony in that first trial, Petitioner says, led to a hung jury.    **Second**, Petitioner argues that he was the victim of ineffective assistance of trial counsel who failed to prepare a defense in the second trial and merely allowed the Government's case to go unchallenged.    **Third**, Petitioner claims that he was the victim of ineffective assistance of trial counsel based upon the failure of counsel to explain to Petitioner the application of the Federal Sentencing Guidelines and how "relevant conduct" would be used to calculate his sentence.    **Finally**, while not so much considered a separate claim, Petitioner says that the cumulative effect of trial counsel's errors require an evidentiary hearing.    It appears to the Court  that Petitioner is requesting the Court: to vacate his sentence and permit Petitioner to enter a plea of guilty; to permit Petitioner discovery; to appoint Petitioner an attorney; and to grant Petitioner an evidentiary hearing.

With respect to the claim by Petitioner that his counsel was ineffective, the Court reviews his allegations under the well established standard set forth in Strickland v. Washington, 466 U.S. 668, 687 (1984), under which a claimant must establish the two prong standard of deficient performance and prejudice.    In other words, in order to succeed on his claim of ineffective assistance of counsel, Petitioner must show that his counsel's performance was deficient in that counsel made errors so serious that he ceased to function as a counsel within the meaning of the Sixth Amendment, and that the alleged deficient performance prejudiced the defense.    Id.

## IV

Petitioner's first claim is that his trial counsel was constitutionally ineffective by failing to call the same prepared and ready witnesses who were used and called during Petitioner's defense in the

first trial and whose testimony in that first trial, Petitioner says, led to a hung jury. Generally, the decision to call witnesses or not call witnesses is a matter within counsel trial tactics and is left to the discretion of counsel. The Sixth Amendment does not require counsel to call potential witnesses where trial counsel is familiar with the substance of the expectant witness's testimony. This is not a situation where the Defendant provided counsel with names of witnesses and trial counsel neglected to pursue and interview the witnesses or where counsel failed to determine whether these witness had any meaningful testimony to refute the evidence of the Government. Here, counsel-- having called the witnesses in the first trial-- was very familiar with the expectant testimony. Counsel decided not to use them in the second trial but rather would focus on attacking the strength of the Government's case.

It is worth noting that the jury was unable to reach verdicts on various counts as to all four of the Defendants who went to trial in the first case. Yet, all Defendants, including the Petitioner, in the second trial were convicted, and it is, of course, impossible to determine the precise reasoning for the decisions by the two different juries. In light of what appears in the record to be considerable evidence of a conspiracy linking Petitioner to the conspiracy and the firearm found in the Chevrolet Tahoe which [the evidence established] Defendant used, it is doubtful that Defendant was deprived of a constitutional right by the decision of his counsel not to call his girlfriend, Bianca Garbutt, whose testimony was confined to placing Defendant on a trip with her in Hawaii. Other witnesses who provided testimony at the trial testified with respect to Petitioner's employment and character. The testimony of these witness did not address the incriminating statements made by Petitioner when he was arrested, did not address the intercepted wiretap evidence under Title III linking Petitioner to the conspiracy, nor did this testimony refute the mound of surveillance and other physical evidence

obtained by law enforcement agents against Petitioner and presented by the Government during the trial second trial. In short, the Court does not believe that Petitioner has shown a reasonable probability that the result of the second trial (in which all defendants were convicted) would have been different if his trial counsel had called the witnesses to testify. The decision not to call the witnesses in the second trial amounts, in the Court's view, to be a tactical decision. Petitioner has not satisfied the two prong standard set forth by *Strickland*. This claim must be denied.

V

Petitioner's second claim is that his trial counsel failed to prepare a defense in the second trial and, merely, allowed the Government's case to go unchallenged. The Court will not try to guess what Petitioner argues in this claim. Petitioner simply says in his comments that his counsel did not present any evidence, did not prepare for the trial and permitted the Government to put on its case without challenge. What the record reflects and what this Court remembers occurring was that Petitioner was superbly represented by a seasoned attorney who provided professional representation. The record reflects that trial counsel for Petitioner filed and argued pre-trial motions, delivered an opening and closing statements, made various evidentiary objections, cross-examined the Government's witnesses and, by all indications, represented Petitioner to the best of his professional ability. There is nothing in the record which undermines the effectiveness of trial counsel's conduct during the trial. Petitioner's general comments, therefore, accusing counsel of failing to prepare a defense in the second trial (in the absence of any specificity whatsoever) are but bald allegations and are devoid of merit. This second claim of ineffective assistance of counsel fails.

8

## VI

Finally, Petitioner claims that he was the victim of ineffective assistance of trial counsel based upon the failure of counsel to explain to Petitioner the application of the Federal Sentencing Guidelines and how "relevant conduct" would be used to calculate his sentence. The *Strickland* analysis applies to claims of ineffective assistance of counsel during the plea negotiations, and with respect to counsel advice, discussions and information provided or not provided by counsel in preparation for sentencing. The Court is required to first determine whether Petitioner can demonstrate that his counsel provided gross mis-advice or that counsel's performance was otherwise constitutionally derelict and, secondly, the Court must then determine that [but for] the performance deficiency there is a reasonable probability that Petitioner would have [in this case] pled guilty.

In this case, Petitioner has included in his Motion and pleadings an affidavit saying that he was never advised that "relevant conduct" played such an integral part of his sentence and had he known such, he would never have gone to trial but rather would have mitigated his case by accepting a plea. On the other hand, the Government has submitted an affidavit by trial counsel which represents that counsel fully explained the application of the sentencing guidelines, including relevant conduct, to Petitioner but that Petitioner was adamant in not accepting a plea agreement. While, the Court recognizes that [after the fact] and self-serving declarations and statements that but for counsel's mis-advice, the defendant would have pled guilty generally are viewed with suspicion, the Court is not yet in a position to made a determination as to the veracity of such a declaration. There appear to be two versions as to what advice was given or was not given. Whether there was a plea offered, whether the plea offer was rejected, and the nature and extent of

9

what information with reference to the application of the guidelines was provided appear to be in dispute. Moreover, to the extent any exists, the Court has not been presented with any objective evidence tending to either corroborate or disconfirm the conflicting declarations in the affidavits. The Fourth Circuit has advised that a District Court may not credit an attorney's affidavit over a petitioner's verified papers without a hearing. See *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). The Court believes that a determining of where the truth lies can be resolved through a hearing.

## VII

In sum, the Court has reviewed the current pleadings and the entire files relative to the present motion as well as the underlying criminal case. The Court finds that Petitioner has not demonstrated a legal and cognizable basis for relief as to claims one and two. With reference to claim three, the Court will set that sole remaining issue down for a hearing to determine whether Petitioner can establish any basis for relief under 18 U.S.C. § 2255. Finally, Petitioner's request for discovery is Denied. A separate Order will be issued.

Date: May 28, 2009

Alexander Williams, Jr.
United States District Judge